**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION**

**RICHARD HATCH**                                                                     **PLAINTIFF**

**V.**                                    **CASE NO. 3:19-CV-3081**

**AT&T SERVICES, INC.**                                                   **DEFENDANT**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court is a Motion for Summary Judgment (Doc. 34) filed by Defendant AT&T Services, Inc.  AT&T also filed a brief in support of its Motion (Doc. 36) and a Statement of Facts (Doc. 35).  Plaintiff Richard Hatch filed a Response in Opposition to the Motion (Doc. 40), a Memorandum Brief in Support (Doc. 42), and a Response to the Statement of Facts (Doc. 41).  The exhibits were filed separately under seal pursuant to the Protective Order.  *See* Doc. 44.  AT&T filed a Reply (Doc. 47).  At the Court's direction, the parties also filed the complete transcript of each deposition submitted for the Court's consideration.  *See* Docs. 52–56.  For the reasons explained below, AT&T's Motion is **GRANTED IN PART AND DENIED IN PART**.

## I.  BACKGROUND

Mr. Hatch worked for AT&T for nearly twenty years.  In 2018 and 2019, his job title was Area Manager – Regulatory Relations, and he worked from an AT&T office in Eureka Springs, Arkansas.  Mr. Hatch's direct supervisor was John Habeeb.  Mr. Habeeb supervised a handful of other employees on the regulatory team, including Greg Wagner and Zaffar Iqbal.  Mr. Habeeb's team was under the leadership of Sue Biancheri, the Vice President for Network Engineering and Operations.

Throughout the time he worked for AT&T, Mr. Hatch suffered from significant health conditions, including Hepatitis C and Type 2 Diabetes. Mr. Hatch's health worsened in the summer of 2018, and in the fall, he sought treatment at the Mayo Clinic, located in Minnesota. He travelled to these medical appointments from his home in Arkansas. On October 10, 2018, Mr. Hatch sent an email to his supervisor, Mr. Habeeb, indicating that he needed to have organ transplants and that he would attend ten or fifteen appointments beforehand as part of the evaluation process. *See* Doc. 54-1, p. 106. Mr. Habeeb forwarded that email to his own supervisor, Ms. Biancheri. *See id.*

Also during September and October 2018, AT&T sought to concentrate employees in specific hub locations or "collaboration zones" around the country, including Dallas, Texas, and San Ramon, California. At team meetings during this period, employees were offered ten thousand dollars to relocate to one of these collaboration zones. Mr. Hatch was not interested in moving to Dallas because it was further away from the Mayo Clinic, where he was having appointments. In November and December 2018, however, understanding that AT&T was concentrating jobs in hub locations, Mr. Hatch told Mr. Habeeb that he was willing to move to Dallas in order to keep his job but that he would not be able to move for several months because of his health conditions and his need to keep appointments at the Mayo Clinic. Mr. Hatch also asked about moving to Kansas City, which is not a hub location, but which would have placed Mr. Hatch closer to the Mayo Clinic. Mr. Hatch says Mr. Habeeb relayed his requests to Ms. Biancheri and she denied them. Ms. Biancheri says Mr. Habeeb never told her of Mr. Hatch's requests.

During this same period, in November 2018, Ms. Biancheri learned that AT&T would be implementing a reduction-in-force ("RIF"). Ms. Biancheri was given a list of

employees who were located outside the collaboration zones and had to determine how to implement the RIF using that list. Employees already located in collaboration zones were not subject to the RIF. Elizabeth Mihalkovitz, an employee in Human Resources, also worked with Ms. Biancheri on this process.

To implement the RIF, Ms. Biancheri arranged the employees at non-hub locations into Affected Work Groups ("AWG"). Mr. Hatch was placed in AWG 3, along with an employee in Richland Hills, Texas, and Mr. Iqbal in Sacramento, California. All three of these positions were eliminated. Mr. Wagner, who held the same job title as Mr. Hatch and Mr. Iqbal and also reported to Mr. Habeeb, was placed in AWG 5 with other workers in San Antonio, Texas. All the positions in AWG 5 were eliminated except for Mr. Wagner's; he retained his position, though he was required to relocate to Dallas at his own expense. In total, ten of Ms. Biancheri's employees were laid off; ten were exempt, including Mr. Wagner, ostensibly because of their roles on specific projects; and three were exempt because they were "actively relocating" to Dallas. *See* Doc. 44-5, pp. 1–6.

Mr. Hatch was informed on January 28, 2019, that his position was being eliminated. Just a few days later, he received notification of his annual performance evaluation for 2018. Clicking into it, he saw that he received the highest rating— "extraordinary impact," or "EI." The following day, however, he received a second notification regarding his evaluation and saw that his rating had been changed to the middle rating, "meaningful impact" or "MI." Mr. Hatch's coworker, Mr. Wagner, also received two versions of his 2018 performance evaluation—in the first, he was rated MI, and in the second, his rating had been raised to EI.

When he learned of the RIF, Mr. Hatch applied for Social Security Disability benefits ("SSDI") though the Social Security Administration ("SSA"). In his application, which he signed under penalty of perjury, Mr. Hatch represented that he had "stopped working" and this was "because of [his] condition(s)." (Doc. 36-1, p. 54). The SSA ultimately determined that Mr. Hatch was disabled as of March 29, 2019, the date his employment with AT&T ended, and began paying him benefits in September 2019.

In November 2019, Mr. Hatch filed this law suit alleging seven claims against AT&T. Mr. Hatch brings claims for wrongful termination because of a disability, denial of reasonable accommodation, and wrongful termination because of protected activity in violation of both the Americans with Disabilities Act ("ADA") and the Arkansas Civil Rights Act ("ACRA"). Mr. Hatch also alleged age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") but subsequently informed opposing counsel that he was not pursuing this claim. *See* Doc. 36, p. 1 n.1. AT&T now moves for summary judgment as to Mr. Hatch's claims for wrongful termination and failure-to-accommodate.[1]

---

[1] The legal standard for each of the ACRA claims is identical to its parallel claim under the ADA. *Duty v. Norton–Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002) ("[W]e analyze a disability claim presented under the ACRA using the same principles employed in analyzing claims under the [ADA]."). The Court's discussion below therefore pertains to each claim under both the ADA and the ACRA. In a footnote, AT&T asserts that the ACRA does not impose a duty to accommodate a disability. AT&T relies on a case in which the Arkansas Supreme Court declined, for purposes of the ACRA, to give the term "disability" the more expansive definition in the federal statute because the plain language of the state statute is narrower. *See Faulkner v. Ark. Children's Hosp.*, 69 S.W.3d 393, 401 (Ark. 2002). In the decades since *Faulkner*, however, the Eighth Circuit has repeatedly reviewed accommodation claims under both the ADA and the ACRA and applied the ADA standard. *See Cochran v. Boar's Head Provisions Co. Inc.*, 2021 WL 500794, at *6 (E.D. Ark. Feb. 10, 2021) (collecting cases). Since the ADA provides a cause of action for Mr. Hatch's accommodation claim, the reach of the ACRA appears to be immaterial, and the Court declines to hold at this time that the ACRA does not require employers to provide reasonable accommodations.

## II. LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, in order for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. DISCUSSION

First, the Court takes up AT&T's argument that Mr. Hatch should be estopped from pursuing his disability claims based on his application for SSDI and concludes that it is a question for the jury whether there is a conflict between his representations to the SSA and his claims in this lawsuit. Next, the Court turns to AT&T's challenge to Mr. Hatch's claims of disability discrimination. The Court determines that Mr. Hatch has made a prima facie case for disability discrimination in the context of an RIF but that there is insufficient evidence in the record to allow a reasonable factfinder to conclude that the RIF was pretextual and that Mr. Hatch was terminated because of his disability. Finally, the Court holds that there is a genuine dispute for the jury as to whether Mr. Hatch requested and was denied a reasonable accommodation for his disability.

### A. Plaintiff Is Not Estopped from Pursuing His Claims

The first question before the Court is whether Mr. Hatch is estopped from pursuing his disability claims because he also applied for disability benefits and the SSA found him to be completely disabled as of March 29, 2019. AT&T argues that, having represented to the SSA that he is unable to work, Mr. Hatch should not be permitted to seek damages from AT&T for denying him the opportunity to work.

In *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), the Supreme Court addressed the question of "whether the law erects a special presumption that would significantly inhibit an SSDI recipient from simultaneously pursuing an action for disability discrimination under the American with Disabilities Act." *Id*. at 797. The Court concluded that "the two claims do not inherently conflict to the point where courts should apply a special negative presumption" based on a plaintiff's application for SSDI

benefits. *Id.* at 802. Rather, the Court instructed that "[w]hen faced with a plaintiff's previous sworn statement asserting 'total disability' or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim." *Id.* at 807. "To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Id.*

Very similar facts were before the Eighth Circuit in *Voeltz v. Arctic Cat, Inc.*, 406 F.3d 1047 (8th Cir. 2005), and that court applied *Cleveland* to hold that the question of potential inconsistency between the plaintiff's ADA claim and his application for disability benefits was appropriately put to the jury. In *Voeltz*, the plaintiff applied for SSDI when he was laid off and represented that he "became unable to work because of his disabling condition" on the date he was laid off. *Id.* at 1050. His employer argued that this "sworn statement of inability to work" could not "be reconciled with his claim in this lawsuit that he could perform his job with accommodations." *Id.* The Eighth Circuit rejected this argument, holding that "[r]easonable jurors could conclude from the evidence both that Voeltz had a good-faith belief in his SSDI statement that he was unable to work and that he 'could nonetheless perform the essential functions of [his] job, with or without reasonable accommodation.'" *Id.* at 1051 (quoting *Cleveland*, 526 U.S. at 807).

The Court has reviewed Mr. Hatch's Work Activity Report, completed by an SSA employee during an interview with Mr. Hatch on February 19, 2019, which alleges an onset date of disability of January 28, 2019. *See* Doc. 36-1, p. 41. The form gives the following explanation about the change in his work status:

DUE TO THE COMPANY CONSOLIDATING OPERATIONS TO DALLAS, WAS GIVEN THE OPTION TO MOVE TO DALLAS OR NO LONGER HAVE A POSITION. TURNED THE ORIGINAL OFFER DOWN IN OCTOBER 2018 DUE TO HEALTH CONDITIONS. ON 01/04/19 WAS TOLD MY POSITION WAS BEING ELIMINATED BUT WOULD STILL BE KEPT ON THE PAYROLL THROUGH 02/18/2019. THAT HAS NOW BEEN EXTENDED TO 03/29/2019 WITH STIPULATION OF TRYING TO FIND A JOB. THERE ARE NO JOBS AVAILABLE FOR ME IN THIS AREA. I AM HELPING SOME WITH THE TRANSITION BUT I AM NOT DOING THE SAME LEVEL OF WORK THAT I AM BEING PAID FOR.

(Doc. 36-1 at p. 45).

On his Disability Report, Mr. Hatch indicated that he stopped working on March 29, 2019, "because of [his] condition(s)" and "because of other reasons." *Id*. at p. 54. He elaborated, "JOB WAS RELOCATED TO DIFFERENT STATE. DUE TO CONDITIONS, NEEDED TO BE CLOSER TO THE MAYO CLINIC." *Id*. The Court concludes there is not an inherent conflict between these representations to the SSA and Mr. Hatch's claim before this Court that he could have continued doing his job with AT&T had he been permitted to delay his relocation to Dallas until after his appointments with the Mayo Clinic. Since the two positions are not irreconcilable, AT&T must present its argument to the jury.

## B. Wrongful Termination

Next, the Court turns to AT&T's argument in the alternative that no reasonable factfinder could conclude that AT&T violated Mr. Hatch's rights under the ADA or ACRA by laying him off. "The ADA makes it unlawful for a covered employer to discriminate against any 'qualified individual on the basis of disability.'" *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013) (quoting the ADA, 42 U.S.C. § 12112(a)). Mr. Hatch does not assert any direct evidence of discrimination, so the Court uses the *McDonnell Douglas* balancing test to assess his claim. Under the familiar framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff alleging disparate treatment or retaliation under

the ADA must first establish a prima facie case of discrimination. *See Olsen v. Capital Region Med. Ctr.*, 713 F.3d 1149, 1153 (8th Cir. 2013).

To establish a prima facie case of disparate treatment, a plaintiff must show that she: "(1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment action because of [her] disability." *E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014) (quotation omitted). "In reduction-of-force cases, we have always required 'some additional showing' that discrimination was a factor in the termination." *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003) (requiring that a plaintiff bringing a race discrimination claim alleging discriminatory discharge show that "he was replaced by a person with similar qualifications" or "some other evidence that would give rise to an inference of unlawful discrimination"); *Aucutt v. Six Flags Over Mid-Am., Inc.*, 85 F.3d 1311, 1316 (8th Cir. 1996) (holding that a plaintiff alleging age discrimination in the context of a reduction-in-force must also "provide some additional showing that age was a factor in the termination" in order to make a prima facie case).

"Once the plaintiff establishes this prima facie case, then a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action." *Id.* "If such reason is provided, the burden shifts back to the plaintiff to show that the employer's proffered reason is merely a pretext for intentional discrimination." *Id.*

First, AT&T asserts that Mr. Hatch has failed to make a prima facie case of disability discrimination in the context of AT&T's RIF. Second, AT&T argues that even if Mr. Hatch has established a prima facie case, the RIF is a nondiscriminatory reason for

Mr. Hatch's termination, and he cannot show that it was pretextual. Taking up these arguments below, the Court concludes that Mr. Hatch has made a prima facie case of discrimination but that he has failed to meet his burden to show a genuine dispute of fact that would allow a jury to conclude that AT&T used the RIF as pretext to lay him off because of his disability.

### 1. Plaintiff has made a prima facie case of disability discrimination

For purposes of its motion, AT&T does not dispute that Mr. Hatch has a disability and is a qualified individual under the ADA. The only question for the Court, then, is whether AT&T terminated his employment because of his disability. AT&T argues that Mr. Hatch failed to make the additional showing necessary in RIF cases. The Court disagrees. As Mr. Hatch points out, the Eighth Circuit has made clear that "the 'additional showing' inquiry is not a significant hurdle for an employment discrimination plaintiff." *Yates v. Rexton, Inc.*, 267 F.3d 793, 799 (8th Cir. 2001). Rather, the "only question is whether the circumstances are such that, in the absence of an explanation from the defendant, a fact finder may reasonably infer intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771 (8th Cir. 1995). Here, Mr. Hatch argues that several aspects of AT&T's treatment of him establish a prima facie case. While some of those arguments are more persuasive than others, the Court concludes that Mr. Hatch has made the "additional showing."

First, Mr. Hatch points to AT&T's more favorable treatment of similarly situated coworkers. Mr. Hatch identifies Mr. Iqbal and Mr. Wagner as employees with the same job title and supervisor as Mr. Hatch but without the same level of disability who retained their positions following the RIF. Second, Mr. Hatch asserts that while Mr. Iqbal and Mr.

Wagner were given the option to move to hub locations in order to retain their employment, Mr. Hatch was not.

The Court does not agree that Mr. Iqbal is an appropriate comparator. Mr. Iqbal suffered the same adverse employment action as Mr. Hatch: He was also laid off in the RIF. While Mr. Iqbal continued working for AT&T without interruption, this was because when he learned that he would be laid off, he applied and was hired for an open backfill position posted at the hub location of San Ramon. Mr. Hatch does not allege that he sought and was denied relocation after he received notification of the RIF in early 2019. Mr. Hatch also does not dispute that AT&T would have given him priority consideration for open positions in collaboration zones and that he did not apply for any such positions after he received notice of the layoff. Mr. Hatch's belief that he was not qualified for the backfill position in Dallas does not change the fact that Mr. Iqbal took affirmative steps to keep employment with AT&T that Mr. Hatch did not take. This makes Mr. Iqbal inappropriate as a comparator.

As for Mr. Wagner, AT&T argues that he is not an acceptable comparator for Mr. Hatch for three reasons: 1) Mr. Wagner was located in San Antonio and was required to move to Dallas to retain his job; 2) Mr. Wagner's position was exempt from the RIF because of the nature of the work he was doing; and 3) Mr. Wagner is also disabled as he has cancer in remission. The Court finds, however, that there are genuine disputes of material fact relevant to this issue and that, viewing the facts in the light most favorable to Mr. Hatch, Mr. Wagner is an appropriate comparator.

First, though Mr. Wagner was in San Antonio and Mr. Hatch was in Eureka Springs, neither of these locations are hubs and both were subject to the RIF. Second, Mr. Hatch

and Mr. Wagner had the same job title before the RIF and reported to the same supervisor. In the implementation of the RIF, the two men were assigned to different AWGs, but both groups were both described as being "responsible for interfacing with and responding to Federal or State Regulatory Commissions . . . on regulatory issues" nationwide. *Compare* Doc. 44-13, p. 5 *with* p. 7. AT&T presented deposition testimony indicating that Mr. Wagner's position was retained because of the specific work he was doing. For example, Ms. Biancheri stated that "for Greg Wagner, Patricia Thatcher and Ann Bornholdt there were regulatory requirements, which made it necessary for us to continue work through the period of time during which the surplus would take place." (Doc. 36-2, p. 16, depo. 40:15–19). Ms. Mihalkovitz understood that Mr. Wagner, along with employees McCracken, Thatcher, and Bornholdt, were exempt from the RIF because of the specific projects they were working on. *See* Doc. 36-3, pp. 5–6, depo. 38:4–39:1. But the documentation does not bear out this assertion, particularly when viewed in the light most favorable to Mr. Hatch. For example, in an email detailing the implementation of the RIF in Ms. Biancheri's team, employees Thatcher, Bornholdt, and McCracken are listed as exempt due to their associations with specific projects, but Mr. Wagner is listed as exempt because of his role as the "Network Regulatory Team lead," though his job title was the same as Mr. Hatch's. *See* Doc. 44-5, p. 1. Similarly, in the detailed spreadsheet included in that email, the "reason for business unit exception" listed for Mr. Wagner is "Top Performer and Lead in Network Regulatory – Critical to ability to support Network Regulatory mandates, consent decrees, etc. given team is being cut by over 70%." *Id*. at p. 4. By contrast, employees Thatcher, Bornholdt, and McCracken are listed as critical to specific programs like the "Connect America Fund," *id*., and the "UMTS/HSPA+ Sunset

program," *id.* at p. 5.  Additionally, when Mr. Habeeb's peer Doug Mathes was asked why Mr. Wagner was exempt, he said nothing about Mr. Wagner's importance to a specific project.  Instead, Mr. Mathes explained that "Greg was like the go-to guy.  So he's like number one, number two in the group.  So he's basically the guy that's keeping everything afloat during this tumultuous situation."  (Doc. 36-4, p. 11, depo. 129:6–9).  Furthermore, another member of the regulatory team, Richard Canaday, was laid off in the RIF even though he was located in a collaboration zone.  Ms. Biancheri indicated that she was "swapping him with Mr. Wagner, so Mr. Wagner's position as Regulatory lead can remain."  (Doc. 44-5, p. 3).  Viewed in the light most favorable to Mr. Hatch, this evidence supports a reasonable inference that Mr. Wagner was retained for some reason other than his unique work with a special project.

Finally, the fact that Mr. Wagner had surgery for prostate cancer in 2010, which has since been in remission, does not prevent him from being an appropriate comparator for Mr. Hatch.  Individuals with "lesser or more easily accommodated disabilities" are still appropriate comparators for ADA claims.  A plaintiff has suffered an adverse employment action "'because of' his or her disability just as surely where the employer terminates the plaintiff in favor of another who also fits within the ADA's definition of 'disable[d],' but whose disability is more cheaply or easily accommodated, as when the plaintiff is terminated in favor of a non-disabled person."  *Hutchinson v. United Parcel Serv.*, 883 F. Supp. 379, 395 (8th Cir. 1995).  *See also Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004) ("In disparate treatment cases, a similarly situated disabled individual is treated differently because of his disability than less- or non-disabled individuals.").  Here, when Mr. Wagner was asked, "Was AT&T aware of you having prostate cancer?" he

responded, "No." (Doc. 44-11, p. 8, depo. 28:10–11). Furthermore, Mr. Wagner testified at deposition that after his surgery in 2010 he was off work "[j]ust for a few days," *id*. at depo. 28:9, that he never requested any type of accommodation due to his cancer, *id.* at depo. 28:15–18, and that other than post-surgery recovery, the cancer has "no significant impact" on his daily life. *Id*. at depo. 27:21–28:4. Based on this testimony, the Court concludes that even if Mr. Wagner can be considered "disabled" for the purposes of the ADA, his disability was "lesser or more easily accommodated" at the time of the RIF than Mr. Hatch's and he is an acceptable comparator for purposes of Mr. Hatch's ADA claim.

For these reasons, the Court concludes that Mr. Hatch has established a prima facie case of discrimination on the basis of his disability.

### 2. Plaintiff Cannot Show that AT&T's Rationale Is Pretextual

Pursuant to the *McDonnell Douglas* framework, the burden now shifts to AT&T to provide a nondiscriminatory reason Mr. Hatch was laid off and Mr. Wagner was not. As has already been stated, AT&T asserts that Mr. Hatch was laid off pursuant to the RIF based purely on his geographic location outside of a collaboration zone and Ms. Biancheri's assessment of the business needs of her organization.

Now, the burden shifts back to Mr. Hatch to put forward evidence such that a reasonable juror could conclude that AT&T's rationale is pretext for disability discrimination. At the third stage of the *McDonnell Douglas* framework, the plaintiff's burden is greater than at the prima facie stage. "To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason." *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010) (quoting *McNary v. Schreiber Foods, Inc.*,

535 F.3d 765, 769 (8th Cir. 2008)). "The plaintiff must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination." *Id*. In this context, Mr. Hatch must point to some evidence to suggest that AT&T chose to retain Mr. Wagner and lay off Mr. Hatch because of Mr. Hatch's disability. While the evidence was sufficient to make a prima facie claim, the Court concludes that Mr. Hatch has not met his burden to show pretext.

As his most compelling evidence of pretext, Mr. Hatch points to the fact that both his and Mr. Wagner's 2018 performance evaluations were altered only a few days after he was given notice of the RIF. Mr. Hatch argues that a reasonable juror could infer that AT&T, knowing of Mr. Hatch's disability and his upcoming organ transplants, switched his original EI rating with Mr. Wagner's lower MI rating in order to justify retaining Mr. Wagner and laying off Mr. Hatch.

AT&T asserts that this is a "red herring" because performance was not a factor in determining who would be retained in the RIF. For the reasons discussed above, the Court disagrees and finds that there is a genuine dispute as to whether Mr. Wagner's status as a "top performer" was the reason he was exempt from the RIF. Nevertheless, even assuming that relative performance was a key factor in AT&T's decision to retain Mr. Wagner and lay off Mr. Hatch, the uncontroverted evidence regarding the 2018 performance evaluations cannot support an inference of disability discrimination.

The final ranking of each employee was determined at a calibration meeting with Ms. Biancheri in November 2018 attended by Mr. Mathes, Mr. Habeeb, and their peers, including Richard Miska. The executives discussed and agreed on the relative ranking of the employees they supervised because there was a numerical cap on the number of

employees in the division who could be given the top ranking. After that meeting, Mr. Miska sent an email to all attendees referring to an attachment that memorialized the agreed rating for each employee to be entered into the computer by employee's direct supervisor. *See* Doc. 52-1, pp. 23–24. While that attachment was not provided to the Court, Ms. Biancheri, Mr. Mathes, and Ms. Mihalkovitz each testified in their depositions that as a result of the calibration meeting in November, Mr. Wagner was ranked as EI and Mr. Hatch as MI. Then, on the afternoon of January 31, Mr. Mathes contacted Ms. Biancheri by email, indicating that he "learned from one of Habeeb's [team members] that his rating was not what was previously agreed to. Can you confirm that the ratings in the system are what [we] previously agreed to[?]" (Doc. 52-1, p. 23). This text is followed by a table, presumably taken from the attachment to Mr. Miska's November email, listing Mr. Wagner's rating as EI and Mr. Hatch's as MI. *See id.* Ms. Mihalkovitz responded early the next morning, clarifying that "the rating that was on the MPP for Gregory Wagner that John [Habeeb] signed and passed to him was an MI, but is [sic] should have been an EI." *Id*. at p. 22. Ms. Mihalkovitz sent another email later that morning elaborating on what she found when she reviewed the evaluations: A report pulled on January 30 showed three employees with the EI rating, including Mr. Wagner and not Mr. Hatch, but "when the appraisal was released for Gregory Wagner[,] somehow the rating showed MI." (Doc. 53-1, p. 15). Ms. Mihalkovitz therefore "moved the appraisal back and per instructions updated the rating to reflect it as EI, as what was agreed to in the calibration." *Id*. Then, a report pulled on February 1 "shows that there are 4 employees with EI, a new name was added[,] Richard Hatch," and "I have moved the appraisal back into John Habeeb's queue for correcting." *Id*. This evidence put forward by AT&T indicates the change in Mr.

Hatch and Mr. Wagner's ratings shortly after the layoffs were announced was to correct an inconsistency between the rankings agreed to at the calibration meeting and those in the computer when the performance evaluations were pushed out on January 31.

In light of this evidence, the burden shifts to Mr. Hatch to come forward with specific facts that would allow a reasonable factfinder to conclude that the change was actually made to justify laying him off because of his health conditions. The Court finds that Mr. Hatch has failed to meet this burden. All Mr. Hatch offers is his assertion that Mr. Habeeb told him he had given Mr. Hatch the higher ranking and Mr. Wagner the lower one. But the statements that Mr. Hatch attributes to Mr. Habeeb in his deposition do not actually conflict with the version of events recounted by Mr. Mathes, Ms. Biancheri, Ms. Mihalkovitz, and their contemporaneous communications. Rather, Mr. Hatch testified that Mr. Habeeb "just basically said that he gave me the higher rating." (Doc. 56, p. 53, depo. 53:6–7). When asked, "Did Mr. Habeeb ever tell you that he had given you the middle rating at the calibration meetings in November of 2018?" Mr. Hatch responded, "No, he did not." *Id.* at depo. 53:8–11. And when asked, "Do you know what evaluation score that you came out of a calibration meeting with?" Mr. Hatch again conceded, "No, I do not." *Id.* at depo. 53:12–14. Similarly, though Mr. Hatch asserted that Mr. Habeeb "told me that Greg had a 'meets' score," *id.* at p. 54, depo. 54:16–17, he acknowledged that Mr. Habeeb had not told him "what score Mr. Wagner came out of the November 2018 calibration meetings with." *Id.* at depo. 54:18–20. Finally, Mr. Hatch said that though he asked Mr. Habeeb why his score had been changed after Ms. Biancheri called him, Mr. Habeeb did not explain it to him. *Id.* at p. 56, depo. 56:4–6.

Mr. Hatch frames this as a he-said-she-said disagreement, requiring that a jury weigh the relative credibility of AT&T's witnesses and Mr. Hatch. The Court disagrees. Nothing in Mr. Hatch's recounting of his conversation with Mr. Habeeb is at odds with AT&T's version of events—AT&T acknowledges that Mr. Habeeb gave Mr. Wagner a score of MI and Mr. Hatch a score of EI at some point on or before January 31, and Mr. Hatch has no evidence to dispute that this was inconsistent with the rankings resulting from the team calibration meeting in November.[2] Thus, the Court concludes that Mr. Hatch has not come forward with any evidence to create a genuine dispute regarding the change in the 2018 performance evaluations, or even created the reasonable inference that such evidence might be obtained if Mr. Habeeb were available for deposition.[3]

---

[2] While the reason for the initial switch in rankings is not material to the Court's holding, the Court finds it plausible that Mr. Habeeb would have agreed to one set of rankings in November and then wanted to reverse them in January given the apparent tension between Mr. Habeeb and Mr. Wagner at the time. In his deposition, Mr. Mathes explained that, in the lead-up to the RIF, he tried to gather information from Mr. Habeeb about his team's work. When he found Mr. Habeeb to be uncooperative, he turned to Mr. Wagner, who became a helpful source of information for him. *See e.g.*, Doc. 52, pp. 24–29, 44–46. Additionally, by the time the layoffs were announced and the performance evaluations released, Mr. Wagner noted that Mr. Habeeb had "become angry and uncommunicative with me," though he did not know why. (Doc. 55, p. 27, depo. 26:23–24). While the Court does not rely on this observation in finding that Mr. Hatch has not met his burden at the third prong, it further underscores why Mr. Hatch's version of events is not inconsistent with AT&T's: It is plausible, in light of this undisputed testimony, that Mr. Habeeb ranked Mr. Wagner as EI and Mr. Hatch as MI at the November calibration meeting but that by January 31, his feelings about Mr. Wagner had changed and, given that he was being laid off and Mr. Wagner was not, he modified the evaluations to reflect his frustrations.

[3] Mr. Hatch also argues that AT&T failed to produce relevant digital records regarding the alteration of the performance ratings and that the Court should weigh this fact in Mr. Hatch's favor in deciding this Motion. If responsive materials requested during the course of discovery were not produced, there are remedies Mr. Hatch could have sought from the Court at that time. No such relief was sought, and the remedy he now requests is not appropriate.

Therefore, no factfinder could reasonably infer that Mr. Hatch was terminated illegally due to his disability.

## C. Failure to Accommodate

AT&T also asks the Court to reject Mr. Hatch's claim that AT&T discriminated against him by failing to provide a reasonable accommodation. Discrimination under the ADA includes, in relevant part, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5). The *McDonnell Douglas* framework does not apply to a plaintiff's claims for failure to accommodate. "This is so because a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive. The *McDonnell Douglas* line of cases, however, is aimed at fleshing out this elusive factual question of intentional discrimination." *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004) (quotation omitted). Instead, the Eighth Circuit has prescribed "a modified burden-shifting analysis," *Fenney v. Dakota, Minn. & Eastern R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003), in which a plaintiff "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it," *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015). The plaintiff then has the burden to show "that the requested accommodation is 'reasonable on its face, *i.e.*, ordinarily or in the run of cases.'" *Peebles*, 354 F.3d at 768 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). "Upon such a showing, the employer is left to 'show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.'" *Id*. (quoting *Barnett*, 535 U.S. at 402).

The Eighth Circuit has also recognized that the ADA creates "a shared responsibility between employers and employees to resolve accommodation requests," *E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 795 (8th Cir. 2007), commonly referred to as the "interactive process," *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 902 (8th Cir. 2009). A plaintiff can demonstrate that her employer failed to engage in this interactive process by showing that:

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 971 (8th Cir. 2014). "Although there is no per se liability under the ADA if an employer fails to engage in an interactive process," *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1021 (8th Cir. 2000), for summary judgment purposes, "the failure of an employer to engage in an interactive process . . . is prima facie evidence that the employer may be acting in bad faith," *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999). "Under these circumstances . . . a factual question exists as to whether the employer has attempted to provide reasonable accommodation as required by the ADA." *Id*.

Here, the Court concludes that factual questions remain regarding Mr. Hatch's failure-to-accommodate claim, and summary judgment for AT&T is not appropriate. First, as discussed above, Mr. Hatch has stated a prima facie case of discrimination. Second, it is undisputed that AT&T knew about Mr. Hatch's disability. Next, the evidence before the Court supports the conclusion that Mr. Hatch requested an accommodation—namely, permission to delay his move to Dallas until early 2019 while he attended appointments

at the Mayo Clinic. As to AT&T's good faith, it is disputed whether Ms. Biancheri knew of Mr. Hatch's request, but, viewing the facts in the light most favorable to Mr. Hatch, a jury could conclude that Ms. Biancheri summarily denied this requested accommodation without explanation, demonstrating a lack of good faith on AT&T's part. Finally, it is reasonable to infer that Mr. Hatch's request could have been accommodated since Mr. Wagner did not actually begin reporting to the Dallas office until March or April 2019. *See* Doc. 55, p. 17, depo. 16:17–19.

AT&T argues that Mr. Hatch requested to move to Dallas or Kansas City and that neither is a request for reasonable accommodation because the move was for personal convenience and not for job purposes. As to Mr. Hatch's request to move to Kansas City, the Court agrees that the request was to facilitate travel to the Mayo Clinic and was not related to the essential functions of Mr. Hatch's job. A factfinder could reasonably conclude, however, that working from Dallas was an essential function of Mr. Hatch's job with AT&T. After all, the RIF targeted employees who were located outside collaboration zones, and Ms. Biancheri acknowledged that if Mr. Hatch had moved to Dallas before the list of employees for the RIF was generated in November 2018, he would not have been laid off. *See* Doc. 54, p. 53, depo. 52:4–6. Additionally, three employees were exempt from the RIF because they were "actively relocating" to Dallas. (Doc. 44-5, p. 6). Thus, the Court understands Mr. Hatch's willingness to move to Dallas not as a request for accommodation but as a desire to fulfill what he understood to be an essential function of his job, and because of his disability, he needed the accommodation of some extra time

to make the move.[4]   For these reasons, the Court concludes that a factual question remains as to whether AT&T discriminated against Mr. Hatch by failing to provide reasonable accommodation for his disability.

## IV.  CONCLUSION

For the foregoing reasons, AT&T's Motion for Summary Judgment (Doc. 34) is

**GRANTED IN PART AND DENIED IN PART**.  The Motion is granted as to Counts II and

---

[4] This framing of Mr. Hatch's requested accommodation, while not always explicit, can be reasonably inferred from Mr. Hatch's representations in this lawsuit.  For example, in his deposition, Mr. Hatch had the following exchange with counsel for AT&T:

Q:  So it [Mr. Hatch's EEOC Charge] says, "I repeatedly requested the opportunity to relocate from Eureka Springs, Arkansas to Dallas/Fort Worth area or Kansas City." When were those requests made?

A:  Probably in November/December of 2018.

Q:  But I understood that you were not able to relocate in that point of time because of your health?

A:  Well, because of my doctor's appointments.

. . .

Q: So help me understand, if you were unable to relocate in November and December of 2018, why were you asking Mr. Habeeb for permission to relocate?

A. Well, to keep employment.

Q:  Well, at that point you weren't aware of the surplus, correct?

A:  No, not until January of 2019.

Q:  So why were you asking Mr. Habeeb about relocating in 2018 if you couldn't relocate at that time?

A:  Well, basically, we knew that all the jobs were moving to hub locations.

Q:  Okay.  And so when you asked him about relocating, did you tell him when you would be able to relocate?

A:  Yes.

Q:  And when was that?

A:  I just told him that it would have to be in 2019.

(Doc. 56, pp. 61–63, depo. 61:19–63:14).

III, Mr. Hatch's claims of wrongful termination in violation of the ADA and the ACRA. Those claims are dismissed, as is Count I, based on Mr. Hatch's representation that he is no longer pursuing his ADEA claim. The Motion is denied as to Counts IV and V, Mr. Hatch's accommodation claims, which remain for trial. Since AT&T's Motion does not address Counts VI and VII, Mr. Hatch's retaliation claims under the ADA and ACRA, the Court assumes that those claims also remain for trial.

     **IT IS SO ORDERED** on this 29th day of June, 2021.

                                   _____
                                   TIMOTHY L. BROOKS
                                   UNITED STATES DISTRICT JUDGE